### COHN et al. v. JAMES McCREERY REALTY CORPORATION.

(Supreme Court, Appellate Division, First Department. February 17, 1905.)

1. REAL ESTATE BROKERS—LEASES—COMMISSIONS—CONTRACTS—EVIDENCE.

A real estate broker stated to one of defendant's officers that he could rent defendant's building for a theater, provided defendant would make certain changes. Several interviews followed, and plans of the desired changes were submitted by architects. The rent was practically agreed upon, and defendant also agreed to pay as commissions not more than $3,000 nor less than $2,500, "depending upon the terms and conditions

made with the proposed tenants." Defendant finally decided not to rent, whereupon the negotiations were terminated. *Held*, that defendant was not liable for the commissions.

**2. SAME—EMPLOYMENT OF BROKERS—QUESTION FOR JURY.**

In an action to recover commissions for finding tenants for defendant's building, the question whether or not defendant ever employed plaintiff *held* one for the jury.

Laughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by Isaac K. Cohn and another against the James McCreery Realty Corporation. From a judgment for defendant and from an order denying plaintiffs' motion for a new trial, plaintiffs appeal. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Emanuel J. Myers, for appellants.
Eugene G. Kremer, for respondent.

INGRAHAM, J. The plaintiffs sought to recover in this action the sum of $3,000, which they alleged the defendant agreed to pay as commissions for obtaining a tenant for a part of a building that was being erected by the defendant in the city of New York. The case was submitted to the jury, who found a verdict for the defendant, and from the judgment entered thereon the plaintiffs appeal.

The plaintiffs were real estate brokers, and the defendant was a corporation, and the owner of a building on the south side of Forty-Second street in the city of New York, extending through to Forty-First street. One of the plaintiffs testified that in June, 1901, he requested an interview with the defendant's officers; that an interview with Mr. Robert McCreery, who was a director and treasurer of the company, followed; that the witness at this interview told McCreery that the plaintiffs had an opportunity of renting his building on Forty-Second street for the purpose of a theater, and asked if he would entertain a proposition of that character; that McCreery said he would let the plaintiffs know if the defendant would entertain such proposition; that the witness, not hearing from McCreery, again called on him, and stated that he was desirous of knowing what McCreery's ideas were, and that the plaintiffs were prepared to make an offer of $25,000 a year for a 21-year lease, provided the defendant would alter the building so as to make it suitable for a theater, stating the names of his clients; that again McCreery stated that he was not prepared to give a definite answer, but would take the matter under consideration; that subsequently the plaintiff took with him to see Mr. McCreery an architect for the purpose of suggesting plans for the alteration of the building, and that McCreery and the architect had some discussion about the details of the alterations; that subsequently the plaintiff met McCreery at the office of the proposed tenants, when the question was discussed, and the architect made a general sketch of the alterations. On October 3d there seems to have been another interview in the office of the proposed tenants. At that time there was dictated to a stenographer what was in form a letter to McCreery, and which purported

to be an agreement to construct a theater on the general plans set out in the previous typewritten documents, and stating that the only change was the matter of rents and time of payment, and the amount of rent was then stated.  Mr. McCreery refused to sign this document, but wrote in pencil, "Rent O. K., R. S. Mc."  There had been estimates as to the expense necessary to alter the building so as to make it suitable for a theater, which it was stated would be in the neighborhood of $80,000.  At this interview the plaintiffs suggested to the tenants that it would be advisable for them to give McCreery $500 in order to show good faith; that the tenants started to do it, when McCreery turned around and said, "That is not necessary, gentlemen, my word is my bond," and that he would have the papers drawn up and sent to him for signature.  The witness further testified that there had been discussions about the plaintiffs' commissions, and McCreery had refused to pay full commissions, but it was finally agreed that the commissions were not to exceed $3,000 and not to be less than $2,500, depending upon the terms and conditions that were made with the proposed tenants.

One of the proposed tenants testified that he conferred with the plaintiff having charge of the negotiations and met McCreery; that the proposal was to get this building altered so that it could be used as a theater, and that there were several meetings at which this subject was discussed; that one day, at his office, the amount of rentals was practically agreed upon; that the tenants' attorney and McCreery's attorney were trying to arrange the terms of a lease, and while those negotiations were pending McCreery wrote a letter to the tenants, stating that they had decided not to build; that there were some leases submitted, but the witness did not examine their contents.  There is evidence that there were considerable negotiations as to the space that was to be occupied by the proposed theater, and that the architect was employed to prepare plans to show the changes that would be required to construct the theater according to the building laws, regulations, and ordinances of the city of New York.  The proposed tenant testified that he was ready to sign an agreement that the defendant was to build a theater for him, and that at that interview with Mr. McCreery at his office the amount of rent which was to be paid if the theater was constructed was agreed to.  The architect testified that he was consulted about the construction of this theater; that he prepared an estimate of the cost of changing the building into a theater, aggregating $80,300; that the first proposition that was made was to use 75 feet of the building on Forty-First street, with a 20-foot entrance on Forty-Second street; that it was subsequently determined that that would not give sufficient space, and the tenants wished to take an additional space on Forty-Second street; that other plans were drawn with more space, making an entrance on Forty-Second street of 25 feet, instead of 20 feet.  On behalf of the defendant the draftsman of the architect testified that he made this sketch of the proposed theater; that he did not regard this as a complete plan; that he commenced work on these plans on September 23, 1901, and did the last work on them on October 18th of the same year; that on October 18th he stopped work, and did not do anything further.  Mr. McCreery tes-

tified that they had several meetings with the proposed tenants, and several papers were drawn up tentatively as forming a basis on which a lease could be made; that he met the tenants at the architect's office, and that all the negotiations were simply tentative; that they continued working on a general plan for a lease to see if some conclusion could be arrived at, but that none was, and in the end the defendant concluded not to alter the building so as to make it suitable for a theater owing to the large decrease in the space which would be left in the building; that on October 3d the position was that the tenants had been brought to a position where they were satisfied, so that he then knew exactly what the tenants wanted; that when McCreery found out what the tenants wanted the question was whether or not they would go ahead and make the alterations, and they finally decided that they would not. It was further proved that there was no resolution of the directors of the company or the executive committee authorizing any lease or agreement for a lease.

It is quite evident that there never was a definite agreement, verbal or otherwise, between the defendant and the proposed tenants for a lease of this property. The original negotiations were started at the instance of the brokers, and the proposition was submitted by them to the defendant to alter this building into a theater. The defendant never did any more than consider this offer. It involved an expenditure by the defendant of a sum exceeding $80,000, and necessarily, before there could be a definite agreement, plans of the proposed alterations had to be made. The evidence is undisputed that these plans were never completed. McCreery testified—and his testimony is not disputed—that the negotiations were to endeavor to ascertain just what it was that the tenants wanted, so as to determine the amount of space in the building which would be required in making the alterations, and the amount of rent that tenants were willing to pay, and then to determine whether or not the defendants would make the alterations; but the plans showing the space, and which would be required before the cost could be determined, were never fully completed. Certainly, up to this time there was no definite agreement which would require the defendants to expend this large amount of money in making the alterations, and until there was such a definite agreement it is quite clear that, even under the contract testified to by the plaintiffs, no compensation was due to them for their services. It was the plaintiffs who first submitted the proposition to the defendant. There was no employment of the plaintiffs to procure a tenant for the defendant, and nothing that imposed upon the defendant an obligation to make these alterations and lease the building when altered. I think, therefore, that upon the whole case the evidence was not sufficient to show that the defendant was liable for the compensation that was agreed upon in the event that a lease was actually made, and that the defendant was entitled to the direction of a verdict at the end of all the testimony. The court, however, submitted to the jury the question whether or not the defendant ever employed the plaintiffs to procure a tenant for the property, stating to the jury that that was the only question. After this charge, which was certainly as favorable to the plaintiffs as the evidence justified, the jurors asked the court several questions, and the

court, in answer to these questions, again called the attention of the jury to the single question that was submitted—as to whether there was at any time an agreement by the defendant to pay the plaintiffs any compensation for procuring a tenant for any property that these tenants finally offered to take.   That question, at least, was one for the jury.

At the end of the case the plaintiffs moved to amend the complaint so that the action should be upon a special contract to pay to the plaintiffs $3,000 if they procured a tenant for certain premises owned by the defendant, dimensions of which were specified by the amendment. Now, this contract to which the plaintiffs testified, the making of which was denied by the officer of the company with whom it is alleged it was made, was that this officer said, "I will agree that your commissions will not exceed $3,000 and shall not be less than $2,500, depending on the terms and conditions we make with the people we are negotiating with."   This conversation appears to have been on the 3d day of October, when the amount that was to be paid as rent was agreed to.   This agreement, as testified to by one of the plaintiffs, shows that at that time there was no definite agreement made as to the lease or the property that was to be included in it, for the amount of the commissions was to depend upon the terms and conditions that the defendant was to make with the proposed tenants.   It is clear that this was an agreement to pay commissions, depending upon a final agreement as to the terms and conditions of the lease made after the agreement as to the amount of the rent;  and this is emphasized by the further statement of Mr. McCreery, who came in, and, when told of the understanding with the plaintiffs, said that he was pleased to know that an amicable agreement had been arrived at, "because the affair had gotten to that shape that he was almost positive the lease would be consummated."   Now, there is no evidence to show that subsequent to this time there was any further agreement as to the terms of the lease, or that at any time the agreement ever became more definite than it was when this alleged agreement as to commissions was made.   The finding of the jury thus being in accordance with the undisputed evidence, it is not necessary that we should examine the case to see whether there was error in refusing some of the plaintiffs' requests to charge.

It follows that the judgment and order appealed from must be affirmed, with costs.

VAN BRUNT, P. J., and PATTERSON and McLAUGHLIN, JJ., concur.

LAUGHLIN, J. (dissenting).   I am of opinion that this judgment should be reversed on the ground that the court erred in instructing the jury both on the law and on the facts in a manner precluding the jury from determining the facts favorably to the appellants upon conflicting evidence, and that the verdict is against the weight of the evidence.   It appears that the brokers were originally employed by the respondent to obtain a tenant for certain premises.   They opened negotiations with Shubert Bros., the theatrical managers.   During the negotiations it developed that the premises originally offered would be inadequate for the purposes of Shubert Bros., who desired to have the

major part of the building transformed into a theater. The respondent, however, owned the premises required in addition. The preponderance of the evidence fairly shows, I think, that the respondent and Shubert Bros. came to an agreement by which the latter were to rent all the premises originally offered and the additional premises deemed necessary, and that all the terms and conditions of the lease were agreed upon, and Shubert Bros. were ready and willing to perform, but the respondent decided not to execute the lease that had been agreed upon. In these circumstances the brokers were entitled to their commissions. I doubt if the jury would have rendered the verdict in favor of the respondent if they had not been misled by the charge of the court upon the facts and law with reference to the right of the brokers to recover as affected by the enlargement of the premises originally offered. At the close of the main charge one of the jurors inquired of the court, "If the defendant made a contract to lease certain parts of that property, and afterwards it was enlarged, but included the parts he had already made a contract for, would he be entitled to our verdict?" to which the court replied, "No; the contract is a contract as a whole," and counsel for plaintiff duly excepted. This inquiry of the jury was evidently directed to the proposition to which I have just adverted. After being out some time, the jury returned to the court, and one of them inquired of the court whether commissions could be recovered if there had been a change in the dimensions of the property to be leased, and the plaintiffs and defendant knew of this change, to which the court replied that the question for the jury to determine was whether the defendant employed the plaintiffs to find a tenant for the piece of property described on the diagram Exhibit 8, saying that the plaintiffs say that they were so employed and the defendant denies it. Exhibit 8 embraced the original premises and the additional premises also. At this time there was a further colloquy between the court and different members of the jury relating to this point, from which it appears that the jurors did not make clear to the court the precise point upon which they desired advice, and consequently they did not receive proper advice. After further deliberation the jurors again returned to the courtroom, and inquired if the president of the defendant admitted on the stand that Shubert offered to give him a check for $500 to bind the agreement covering the proposed lease, and if the lease was based on the plan known as "Exhibit 8." The reply was that the court could not tell the jury whether it was based on Exhibit 8, but the inference from the testimony was that it was before the 3d day of October. It appeared from the testimony that Exhibit 8 was not fully completed until some time after the 3d of October. This exhibit is merely a ground plan, indicating the manner in which the premises were to be arranged for use by the tenant, but it contains no dimensions and shows no scale. Its only materiality upon the point under discussion was that it indicated the outline of the entire premises to be leased by the tenant, including those originally offered and those added as the result of subsequent negotiations. It contains no agreement or reference to any agreement. The time of the completion of that diagram was not important. The material question was whether the parties had agreed upon renting the enlarged tract, and, although the jurors

referred to the diagram, it is evident that their inquiries related not to the diagram, but to the agreement concerning the additional space, and that they were misled by the remarks of the court with reference to the time the diagram was completed. After further discussion between counsel and the court, a juror inquired whether they were to decide whether plaintiffs were engaged to find a tenant for the premises according to the original plan or according to Exhibit 8, and stated that the question was asked to satisfy the minds of the jurors whether Exhibit 8 was the original plan. In reply to this the court stated that it was not. After still further discussion between the court and counsel a juror stated interrogatively, "You have charged us as a positive fact that the check was not offered in consideration of Exhibit 8," to which the court replied that the president of the defendant testified that he did not know "at what conversation that took place." After still further discussion between the court, counsel, and a juror concerning this Exhibit 8, and the time the money was offered to bind the bargain— which concededly was October 3d—counsel for the plaintiffs, apparently addressing the court, said, "Mr. McCreery testified that at that time, on October 3d, when the rent was exactly fixed, it was known how much of the property would be taken." Whereupon the court said, "I will state to the jury that on October 3d there is no evidence showing that the plans and specifications known as 'Exhibit 8' were submitted to Mr. McCreery," to which counsel for the plaintiff duly excepted. This was the last instruction given by the court before the rendition of the verdict. The statement thus last made by counsel for the plaintiffs is in accordance with the testimony of Mr. McCreery, and was evidently made with a view to having the jury so instructed. It is manifest that the jury were misled by the importance attached to Exhibit 8 by the court. There was evidence tending to show that Exhibit 8 was before the parties on October 3d, but, as already observed, it was not important. The important thing was that the minds of the parties had met upon the space, the terms, and the rent, and the time of payment, and that occurred on October 3d, when the check was tendered.

For these reasons I dissent from the affirmance of the judgment and order.